Filed 11/6/20  In re C.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

|  |  |
|---|---|
| In re C.B. et al., Persons Coming Under the Juvenile Court Law. | |
| | D077667 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. Nos. SJ13338BCD) |
| Plaintiff and Respondent, | |
| v. | |
| O.U., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin R. Rae, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel for Plaintiff and Respondent.

O.U. (Mother) appeals from juvenile court orders declaring her children, C.B. (age 8), S.B. (age 6), and N.B. (age 5) (collectively, children), dependents and removing them from her custody. (Welf. & Inst. Code,[1] § 300, subd. (b)(1).) Mother, who described herself as a "recovering addict," contends the orders are not supported by substantial evidence because by the time of the jurisdictional hearing she had completed inpatient substance abuse treatment and had six months of sobriety. Mother also challenges the order removing the children from the maternal grandmother (Grandmother), with whom the children were living, asserting that Grandmother was entitled to statutory rights of a guardian.

We affirm the jurisdiction and disposition orders. Like the juvenile court, we commend Mother for her progress toward overcoming her methamphetamine addiction. However, given Mother's longstanding drug use and nascent sobriety, the juvenile court reasonably determined that her recovery remained tenuous. We also reject Mother's contention that the court should have afforded Grandmother the statutory rights of a legal guardian.

Mother also contends that even if Grandmother is not a guardian, the matter should be remanded to the juvenile court so it may exercise its discretion to order services be provided to Grandmother. However, as explained in part IV, the juvenile court's order already requires the Agency to provide such services if a requisite to placing the children with her. Accordingly, we affirm the jurisdiction and disposition orders.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The 2017 Dependency*

Mother and Father married each other in 2008 and are separated. In January 2017, the San Diego County Health and Human Services Agency (Agency) filed a dependency petition for the children based on allegations of physical abuse and substance abuse by Mother and her boyfriend, Tommy A. The juvenile court terminated jurisdiction in May 2017 and placed the children with their father (Father), "to protect the children from further abuse from Mother's home." However, after the case was terminated, Father returned the children to Grandmother and Mother's custody.

B. *The 2019 Family Court Custody Order*

For reasons unexplained in the record, in 2019 Father initiated family court proceedings naming Mother as respondent and Grandmother as "additional third party."[2] In April 2019, the family court ordered that (1) Father and Grandmother share legal custody of the children; (2) Mother, Father, and Grandmother have access to the children's medical and school records and authority to obtain emergency health care services for the children; (3) Grandmother have physical custody of the children weekdays, Father on weekends; and (4) Mother's contact with the children would be supervised "at all times" by Grandmother or "another trusted relative." The family court also ordered no contact between Tommy A. and the children.

C. *Bruises on N.B.'s Arm*

On August 7, 2019, the Agency received a report from N.B.'s school that the child had a large patterned bruise on her upper arm. When a

---

[2] Without citing the record, the Agency asserts that Father commenced the family court proceeding "to formalize" the custody arrangements he and Grandmother had established after the 2017 dependency case.

3

teacher asked N.B. about the mark, N.B. nervously stated, "It's paint." However, the school nurse was unable to remove the marks because they were not paint, but bruises. N.B. told the social worker that Grandmother disciplines by hitting with a shoe, and that Grandmother also hits C.B. and S.B. A physician examined N.B. and concluded the bruises are "definite evidence of physical abuse."

Grandmother insisted that the marks were paint, denied using physical discipline, and characterized the Agency's involvement as "nonsense." She admitted allowing Mother to have unsupervised visits with the children, in violation of the family court order. Grandmother also acknowledged that Mother had an untreated methamphetamine addiction and a continuing relationship with Tommy A., who had previously physically abused C.B.

The social worker found marijuana, hash oil, methamphetamine pipes, and marijuana vape pens among the children's belongings at Grandmother's home. Grandmother denied knowing anything about these drugs. However, her 86-year-old husband told the social worker that he believed the marijuana was oregano and the drug paraphernalia was "art supplies." He told the social worker that Mother stayed at their home twice a week and is using drugs.

In an interview with the social worker, Father was belligerent and denied that any physical abuse had occurred. He claimed that Grandmother had "guardianship" of the children. Later, he told the social worker that Mother smokes methamphetamine and has been in and out of treatment since 2017.

D. *Dependency Petitions*

On August 12, 2019, the Agency filed a dependency petition under section 300, subdivision (b) for each of the children. Each petition alleges

4

that while in Grandmother's care, N.B. sustained "patterned bruises" for which Grandmother "has no plausible explanation" and N.B. reported that Grandmother disciplines by hitting the children with a shoe. The petitions further allege that "a glass pipe, vape pens, dispensers, a bag of marijuana, and two containers of hash oil" were present in the children's bedroom, "among the minors' toys . . . ." The petitions additionally allege that in 2017 "the children were removed from their mother due to the mother's boyfriend hitting [C.B.] in the face with a sandal and due to the mother's methamphetamine use, and [Grandmother] has allowed the mother unrestricted access to the children in violation of a previous court order . . . ."

E. *Detention Hearing/Grandmother's Status*

At the August 14, 2019 detention hearing, the court appointed counsel for Grandmother, referring to her as "the guardian." The Agency's lawyer objected, stating, "We know that she is custodial, but don't believe that she is an actual legal guardian." Nevertheless, the court ordered the petition amended to add Grandmother as a party. The juvenile court also ordered the children detained in foster care.

At a hearing several weeks later, County counsel informed the court that Grandmother is "not the legal guardian. She was a custodian for the children pursuant to family court orders." However, because the family court had "essentially treated [Grandmother] as a parent," the juvenile court maintained it was appropriate to add Grandmother to the petitions. The Agency provided Grandmother with voluntary referrals, and Grandmother sought de facto parent status.

F. *Mother's Untreated Drug Use*

On August 27, 2019, Mother tested positive for methamphetamine and THC. About a week later, the Agency reported that Mother was homeless.

5

Mother, now 32 years old, had been smoking marijuana since age 18 and methamphetamine since age 29. She admitted that the drugs and paraphernalia found at Grandmother's home were hers. Mother stated that her only periods of sobriety had been during her pregnancies. She wanted the children returned to Grandmother, tearfully saying, "That's their mom."

G. *Grandmother's Failure to Protect*

In a September 2019 report, the Agency noted that Grandmother continued to deny using physical discipline and denied causing N.B.'s bruises. Grandmother acknowledged that Tommy A. had close contact with Mother. She also admitted that the children were left unsupervised in her home with Mother for several days, and that she allowed Mother to be unsupervised with children at a nearby park. Grandmother stated she never thought about the possibility that Tommy A. could be at the park or her home while she was away.

H. *Children's Bond with Grandmother*

At the August 2019 detention hearing, counsel told the court that the children wished to be returned to Grandmother "as soon as possible." The following month, the social worker reported that the children miss Grandmother and want to return to her care. Grandmother had shown remorse, was asking for placement, and the social worker stated that the children have a "very strong bond" with her.

I. *Mother's Drug Treatment*

In November 2019, Mother entered an inpatient substance abuse treatment facility in Tijuana. About a month later, while waiting for an opening in a San Diego County inpatient facility, Mother enrolled in an outpatient treatment program and was living with Grandmother.

6

On December 30, 2019, Mother tested positive for methamphetamine and entered an inpatient facility. While there, in January and February 2020, Mother had 10 random drug tests, all with negative results.

By April 2020, Mother had completed 90 days of treatment and an 18-hour parenting class. She transitioned to a sober living facility on April 27.

In June 2020, the Agency reported that Mother was doing well in treatment, was participating in a 12-step program, and had obtained part-time employment. The Agency concluded, "Mother has made great progress . . . [,] has immersed herself in her services, and has made significant strides to live a clean and sober lifestyle."

J. *Father's Relapse*

Meanwhile, Father lost his job, was involved in domestic violence with his ex-girlfriend, and was arrested for possessing methamphetamine and "cruelty to a child in an incident where he was in a hotel room with two others and their two-year old child." Father refused to participate in reunification services unless court ordered, called the social worker a "fucking bitch," and failed to appear at the jurisdictional and dispositional hearing.

K. *Jurisdiction and Disposition Hearing*

At the June 25, 2020 jurisdiction and disposition hearing, the court received the Agency's reports in evidence. By stipulation, Mother testified that she has successfully completed inpatient treatment and is employed at a retail store. Mother is currently in an outpatient program and residing in sober living housing.

By stipulation, Grandmother testified that she has voluntarily completed seven of eight parenting classes.

7

The juvenile court found that the allegations in each petition were true. Although commending Mother on her substance abuse treatment, the court found it would be detrimental to place the children with her (or with Father) due to "multiple untreated protective issues." The court placed the children in foster care. If the children could not ultimately be reunified with Mother, then they would be placed with Grandmother.

The court granted Grandmother's application for de facto parent status, but struck Grandmother from the petitions because she is not a legal guardian.

DISCUSSION

I.

THE COURT'S JURISDICTIONAL FINDINGS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE

A. *Dependency Jurisdiction*

Section 300, subdivision (b)(1) authorizes a juvenile court to exercise dependency jurisdiction where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." The Agency must show by a preponderance of the evidence: "(1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848; § 355, subd. (a).) The third element requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future. (*In re Jesus M.* (2015) 235 Cal.App.4th 104, 111.)

8

B. *The Standard of Review*

In reviewing the court's findings for substantial evidence, we "view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment." (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.)

C. *The Jurisdictional Findings Are Supported by Substantial Evidence*

Mother contends the court's jurisdictional findings are not supported by substantial evidence because "at the time of the jurisdiction hearing the minors were not in substantial danger of serious physical harm." Mother asserts that even if there had been substantial risk of harm in early 2019, by the time of the jurisdictional hearing in June 2020, there was no risk because Mother "had completed inpatient substance abuse treatment and a parenting program and was in a recovery residence, in ongoing outpatient treatment, and continued to test negative for substances." Mother further contends that Grandmother had substantially completed parenting class, further reducing any risk of harm. Mother concludes there is "no basis for finding the minors are currently at risk in their original home, with [Grandmother]."

Substantial evidence supports the court's jurisdictional findings. Under section 300, subdivision (b)(1), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child. This statute requires a " 'substantial risk' " that the child *will be* neglected. (*In re E.E.* (2020) 49 Cal.App.5th 195, 212

9

(*E.E.*).) Moreover, "a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (§ 300.2.)

Mother had made progress towards overcoming her methamphetamine addiction. However, Mother has a three-year history of methamphetamine abuse and tested positive for methamphetamine within the last 10 months. Additionally, despite being in an inpatient drug treatment facility in September 2019, Mother relapsed in December 2019, testing positive for methamphetamine.

At the time of the jurisdictional hearing, Mother had six months of sobriety. Like the juvenile court, we commend and respect that achievement. However, Mother's sobriety occurred in the highly structured setting of a residential treatment program and subsequent sober living environment. The unfortunate reality of drug addiction is that relapse is common, and it is indisputable that Mother remains in the early stages of recovery.

Recognizing that long term drug addiction cannot be resolved in a matter of months, courts have held that the threat of relapse is sufficient to find a substantial risk of harm, even after lengthy periods of sobriety. (*In re J.C.* (2014) 233 Cal.App.4th 1, 6-7 [seven months of sobriety were insufficient to show the parent was not at risk of relapsing]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424 [200 days of sobriety not enough to assure no relapse]; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"].)

Mother's three-year history of methamphetamine abuse, compared to a relatively short period of sobriety, shows the risk of relapse remains and the danger to the children is not over. It is reasonable to conclude that a parent's

10

long-term struggle with substance abuse cannot be ameliorated within a few months, no matter how earnest a parent's intentions. Given the lengthy history and severity of Mother's drug abuse, the juvenile court could reasonably find that her ability to maintain sobriety within the confines of a strictly supervised (but relatively short) residential treatment program was insufficient to demonstrate the same ability to maintain an unsupervised drug-free life on a long term basis. Accordingly, substantial evidence supports the juvenile court's jurisdictional findings.[3]

## II.

## THE COURT'S DETRIMENT FINDING IS SUPPORTED BY SUBSTANTIAL EVIDENCE

A. *Legal Principles and the Standard of Review*

" ' "A dependency proceeding under section 300 is essentially a bifurcated proceeding." ' " (*E.E.*, *supra*, 49 Cal.App.5th at p. 205.) Where, as here, the court exercises jurisdiction over the minor, it must decide the appropriate disposition. "Generally, the court chooses between [1] allowing the child to remain in the home with protective services in place[;] and [2] removing the child from the home while the parent engages in services to facilitate reunification." (*Ibid.*)

---

[3] In asserting that the jurisdictional findings are unsupported, Mother relies on *In re Kaylee H.* (2012) 205 Cal.App.4th 92. However, in that case, the drug-addicted parents arranged for a relative to become a legal guardian, and the probate court had granted the relative temporary guardianship. (*Id.* at p. 97.) The juvenile court subsequently dismissed the guardianship proceeding and removed the child from parental custody. (*Id.* at pp. 97-100.) This court reversed the juvenile court's orders, finding the court had abused its discretion in not considering whether the guardianship adequately protected the child's safety and well-being. (*Id.* at pp. 105-110.) *Kaylee H.* is distinguishable because Grandmother is not a guardian.

After declaring a child a dependent and removing the child from his or her custodian, the court must determine whether a noncustodial parent wants custody. (§ 361.2, subd. (a).) The court must place that child with the noncustodial parent unless it finds by clear and convincing evidence that such a placement would be detrimental to the child's safety, protection, or physical or emotional well-being. (§ 361.2, subd. (a); *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)[4]

We review a removal order for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) However, because the juvenile court's findings must be based on clear and convincing evidence, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting [this] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

---

[4] Section 361.2, subdivision (a) provides in part: "(a) If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

B. *The Disposition Order is Supported by Substantial Evidence*

Essentially repeating her challenge to the jurisdictional findings, Mother contends "there is no *current* detriment to the minors if returned home" because she is "no longer with the boyfriend [Tommy A.], has undergone extensive services, has had almost six months of sobriety and is already having unsupervised visits." (Italics in original.)

However, on admission to inpatient treatment in December 2019, Mother was diagnosed with "[s]evere methamphetamine use" and "[s]evere cannabis use" disorders. At the disposition hearing in June 2020, Mother was new in recovery when compared to her 14-year history of substance abuse that included daily use of marijuana to control her "mood swings" and "aggressive tendencies."

Additionally, Mother was still involved with Tommy A., who in 2017 hit five-year-old C.B. in the face with a sandal. Despite the family court order prohibiting contact between the children and Tommy A., Mother allowed him inside Grandmother's home when the children were present. In late July 2019, police responded to Grandmother's address on a report that Mother and Tommy A. were having sex in public there. In September 2019, Tommy A. drove Mother to her appointment with the social worker. Father attributed Mother's continuing methamphetamine abuse to Tommy A.'s influence.

At the June 2020 disposition hearing, in stipulated testimony Mother addressed her recent substance abuse treatment and employment. Conspicuously absent in her testimony was any acknowledgment of the danger posed to the children by Tommy A. and her past failure to protect them from him. To the contrary, in conversations with the social worker, Mother denied that Tommy A. physically abused C.B. despite the 2017 dependency case determination that he physically abused C.B.

13

In determining whether a child may be safely maintained in the parent's physical custody, the court may consider the parent's past conduct if there is reason to believe the conduct will continue. (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.) Moreover, a parent's lack of insight into, and denial of dependency issues support a finding that the parent is not likely to modify behavior without court supervision. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

Here, Mother's comparatively short period of sobriety, her prior exposure of children to Tommy A., and her denial of his 2017 physical abuse of C.B. support the juvenile court's determination by clear and convincing evidence that "it would be detrimental to place with [Mother] due to the multiple untreated protective factors that exist."

### III.

### THE JUVENILE COURT CORRECTLY DETERMINED THAT GRANDMOTHER MAY NOT ASSERT THE RIGHTS OF A GUARDIAN

Throughout the dependency statutes, the Legislature refers to "parents" and "guardians." (*In re Carrie W.* (2003) 110 Cal.App.4th 746, 758.) "[T]he 'guardians' portion of 'parents or guardians' appears to refer to situations where a child enters the jurisdiction of the dependency court with a guardianship previously established in probate court" or family court. (*Ibid.*)

Pertinent here, under section 361, subdivision (c), the court shall not remove a dependent child from the physical custody of his or her "parents" or "guardian" with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence that there is or

14

would be a substantial danger to the minor's health, safety, protection, or physical or emotional well-being. The court must also find that there are no reasonable means by which the minor's physical health can be protected without removal from the minor's "parent's" or "guardian's" physical custody.

Similarly, under section 361.5, subdivision (a), and subject to enumerated exceptions, "whenever a child is removed from a parent's or guardian's custody," the juvenile court shall order the social worker to provide "child welfare services" to the mother, "statutorily presumed father" or "guardians."

Initially there was some confusion about whether the family court order had established Grandmother as the children's guardian. Father claimed that Grandmother had "guardianship"; however, the family court order giving Grandmother shared custody of the children repeatedly refers to her as a "third party" and not as a "guardian."

At the jurisdictional and dispositional hearing, the juvenile court determined that Grandmother was not a legal guardian because she was not so appointed by any court. Accordingly, because Grandmother was neither parent nor guardian, the juvenile court found it unnecessary to make findings under the above-referenced statutes and ordered Grandmother to be "stricken from the petition."

On appeal, Mother contends that the family court order giving Grandmother shared custody of the children effectively made her the children's legal guardian. From that premise, Mother contends the juvenile court erroneously failed to make the requisite findings of detriment to support removing the children from Grandmother's custody.[5]

---

[5] Grandmother did not appeal. Mother contends she has standing to assert that the court erred in failing to accord Grandmother guardianship

Under the family court order, Grandmother and Father "share" legal custody of the children, with each possessing "decision-making authority" regarding the children's health, education, and welfare. The family court also ordered shared physical custody, with Grandmother having the children weekdays, Father on weekends, and Mother for some holidays (supervised by Grandmother).

As a matter of law, Grandmother is not the children's guardian. When the court appoints a guardian, the parents' authority "ceases." (Fam. Code, § 7505, subd. (a).)[6] The court may allow parent(s) visitation (*Guardianship of Martha M.* (1988) 204 Cal.App.3d 909, 911), but the responsibility for making decisions for the minor(s) is transferred to someone other than the parent. (*Guardianship of Stephen G.* (1995) 40 Cal.App.4th 1418, 1425-1426.)

In this case, the family court order does not create a guardianship because Father's parental right to control and make decisions for the children is not suspended; it is shared. Under the order, Grandmother shares "decision-making" authority with Father. Moreover, the order also retains both Father's and Mother's parental rights to the children's medical and

---

rights because "if grandmother is treated as a guardian this will benefit Mother and her children by increasing the chances the minors will be placed with family and increasing Mother's chance to reunify." Because the Agency's brief does not challenge this statement, nor does the Agency contest standing on any other basis, we assume without deciding that Mother has standing to raise these issues.

[6]     Family Code section 7505, subdivision (a) provides: "The authority of a parent ceases on any of the following: [¶] (a) The appointment, by a court, of a guardian of the person of the child."

school records, as well as their right to obtain certain health care for the children.

The distinguishing characteristic of guardianship is that parental rights are "completely suspended" for the duration of guardianship. (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1124 (*Ann S.*).) Grandmother is not a guardian because the parents' rights have not been completely suspended. Moreover, the family court order clearly indicates an intention *not* to create a guardianship. In five separate places, the court interlineated the standard form to refer to Grandmother not as guardian, but rather as "3d party."

Mother asserts that Grandmother should be treated as the children's guardian because the family court order gave her "comprehensive rights and duties" to care for the children. However, the dispositive issue is not what rights Grandmother obtained under that order, but rather what rights the parents retained.

In a related argument, Mother contends that "as a practical matter," treating Grandmother as a legal guardian advances the purposes of dependency laws. She notes that the children have lived with Grandmother most of their lives and want to return to her. Although Mother does not openly acknowledge this, the underlying premise of her argument is that courts may recognize a de facto or informal guardianship based upon the would-be guardian's conduct and the children's desires. However, the California Supreme Court has foreclosed this argument, stating that "California law does not recognize 'informal' guardianship." (*Ann S., supra*, 45 Cal.4th at p. 1125, fn. 7.)

17

## THE JUVENILE COURT ORDERED THE AGENCY TO PROVIDE SERVICES TO GRANDMOTHER IF A REQUISITE TO PLACEMENT

A. *Background*

In closing argument, the Agency asserted that Grandmother should be "struck from the petition" and not provided family services because she is not a guardian. In contrast, the children's lawyer asked the court to provide Grandmother with services, noting that Grandmother "was a primary caregiver for these girls, and she would likely be a placement option with the mother." Elaborating, the children's lawyer noted that ultimately the children were likely to be placed in Grandmother's home:

> "As to Maternal Grandmother, I'm in agreement with providing her with services . . . . If the mother continues with her sobriety and is able to reunify with the girls, it would likely be in the maternal grandmother's house. So I believe that it would be in the minors' best interest for the maternal grandmother to receive additional counseling to address what the Agency sees are deep-rooted issues of co-dependency with the mother."

Grandmother's lawyer also asked the court to provide her with services, stating:

> "The fact that she took care of the children, that the [family] court recognized her to provide their day-to-day needs in conjunction with the father . . . this court can still find she gets services . . . ."
>
> "[¶] . . . [¶]
>
> "I think, in this case, the court can also provide services to Maternal Grandmother . . . [because] this is not a traditional family. This is not going to be Mom, Dad, and kids, but Grandmother, Mother, and children. Mother

relies on Maternal Grandmother and Maternal Grandfather. It seems to be a good source if it can be fixed.

"[¶] . . . [¶]

"So if this court does make a true finding, Maternal Grandmother is requesting services. . . . She's amendable [*sic*] to doing . . . services up to and including therapy."

Mother's lawyer also supported Grandmother's request for services, noting the children's desire to live with Grandmother:

"The children have detailed in their conversations with the Agency and throughout the reports that they miss their grandmother, they ask to go home to her, and they're bonded to her."

Mother's lawyer further asserted that "the best transition would be to transition back into the maternal grandmother's home . . . ."

Recognizing the children's bond with Grandmother, the court stated, "So Plan B, if the children couldn't be reunified with Mom, it would be with [Grandmother]." Next, the court noted that Grandmother was in the Resource Family Approval (RFA) process.[7] The court ordered the Agency to provide family services to Grandmother if required for RFA approval, stating:

"The court: And here's—the situation I want to avoid is this: [Grandmother] is asking for services. The Agency is telling her she's not entitled to them. I don't want to end up in a situation where her home has been approved for RFA, but for the fact that she hasn't participated in services that the Agency wouldn't give her. *So if the Agency is going to expect her to complete certain services in*

_____

[7] The California Department of Social Services describes RFA as "a new family-friendly and child-centered caregiver approval process . . . ." (https://www.cdss.ca.gov/inforesources/resource-family-approval-program).

19

*order to approve her home, then the Agency needs to make
the referrals to those services.*"  (Italics added.)

In response, the Agency's lawyer stated, "Understood, Your Honor."

B. *Mother's Contention*

Mother contends that even if Grandmother is not a guardian, the
juvenile court still had discretion to and should have "ordered reunification
services" under its "inherent powers to support the best interests of the
minors."  Mother asserts that the court "apparently assumed it did not have
this authority, as it deferred to the Agency's denial of services."  Mother is
concerned that "if the Agency decides [Grandmother] needs services to get
placement, and the Agency will not provide them, then the minors will
continue to languish in foster care and may lose the chance to reunify with
Mother or [Grandmother]."  Mother contends that the court's failure to
exercise its discretion to provide services to Grandmother is itself an abuse of
discretion requiring remand.

C. *Analysis*

We disagree with Mother's interpretation of the court's order.  The
plain language shows that the juvenile court has already exercised discretion
and has granted the relief Mother seeks.  At the hearing, the court ordered
the Agency to provide Grandmother with referrals to services that were
required "in order to approve her home."  The minute order incorporates by
reference this part of the transcript, stating:

> "The court discusses the RFA process for maternal
> grandmother and states that maternal grandmother should
> continue to be evaluated; more fully set forth on the
> record."

Mother's concern that "if the Agency decides [Grandmother] needs
services to get placement . . . the Agency will not provide them" is unfounded

20

because the juvenile court has already *ordered* the Agency to provide such services, to which the Agency acquiesced by its attorney's responding, "Understood, Your Honor."

On appeal, however, the Agency has changed its position and opposes providing any services to Grandmother. Entirely apart from forfeiture that would ordinarily result from the Agency's consent to the order in the juvenile court, the Agency's argument also fails because it is based on three factual errors.

First, the Agency mischaracterizes the court's order by claiming that the court merely made "comments" that services should be provided to Grandmother. The court did not make mere "comments"—it made an order, stating that the Agency "needs to make referrals . . . ."

Second, the Agency contends that Mother has forfeited the issue by not raising the point in the juvenile court. However, Mother's lawyer urged the juvenile court to provide Grandmother with services, stating, "we would support . . . the request for family reunification or family maintenance services on [Grandmother's] behalf."

Third, the Agency contends that the juvenile court concluded that it lacked authority to order services for Grandmother and "did not err in declining to order reunification services." However, the Agency misstates the record. The court clearly ordered services, stating, "if the Agency is going to expect [Grandmother] to complete certain services in order to approve her home, then the Agency needs to make the referrals to those services."

DISPOSITION

The orders are affirmed.

McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


GUERRERO, J.